UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JERRELL R. JOHNSON, Administrator of :
The Estate of Kirill Denyakin, Deceased,:
          :
   Plaintiff,     :
          :
v.          : ACTION NO. 2:11cv415
          :
STEPHEN D. RANKIN,    :
          :
   Defendant.    :

## MEMORANDUM ORDER

This matter is before the Court to resolve a Motion to Quash a subpoena duces tecum filed by non-party Virginia State Police ("VSP"). Plaintiff, Jerrell R. Johnson ("Johnson") subpoenaed records of the VSP's investigation into the shooting death of his decedent, Kirill Denyakin ("Denyakin"), which underlies Johnson's claims against Defendant, Stephen D. Rankin ("Rankin"), a Portsmouth police officer. Johnson's subpoena requested materials from the VSP investigation of the incident in which Johnson alleges that Officer Rankin used excessive force against Denyakin. (ECF No. 28-6).

By prior Order (ECF No. 32) the Court denied in part the VSP's motion and ordered documents responsive to the subpoena produced for in camera review. On October 24, 2011, VSP

1

produced the materials in two binders which the Court has reviewed in detail.

The objections raised by VSP involved its claim of a governmental or law enforcement privilege as a result of an ongoing investigation into possible criminal charges. The governmental privilege, sometimes called executive privilege, is intended to protect the decision-making process by barring disclosure of "intragovernmental documents reflecting advisory opinions, recommendations and deliberations." Castle v. Jallah, 142 F.R.D. 618, 620 (E.D. Va. 1992)(citations omitted). Because the focus is on preventing disruption of the deliberative process, the privilege generally doesn't apply after the process is concluded. Also, "compiled factual material or purely factual material contained in deliberative memoranda [but] severable from its context" generally must be disclosed. Id.; Rhodenizer v. City of Richmond Police Dept., No. 3:09cv306, 2009 WL 3334744 (E.D. Va. October 14, 2009) (unpublished).

In arguing the motion and opposition, both parties rely on the ten factors described in Frankenhauser v. Rizzo, 59 F.R.D. 339, 344 (E.D. Pa. 1973). Though not explicitly adopted by the Fourth Circuit, the Frankenhauser factors are widely followed in cases of governmental or investigative privilege. Cruz v. Bd. of Supervisors, 983 F.3d 1055 (table) (text in Westlaw) 1993 WL 2667 (4th Cir. 1993) (unpublished). Castle, 142 F.R.D. at 621-

2

22; Rhodenizer, 2009 WL 3334744 at *3. Frankenhauser instructs
that claims of governmental privilege require the Court to
"balance the public interest in the confidentiality of
governmental information against the need of a litigant to
obtain data, not otherwise available to him with which to pursue
[his] cause of action." Frankenhauser, 59 F.R.D. at 344.

   Frankenhauser suggested ten factors to guide the necessary
balancing:

   1.   The extent to which disclosure will thwart
        governmental processes by discouraging citizens from
        giving the government information;

   2.   The impact upon persons who have given information of
        having their identities disclosed;

   3.   The degree to which governmental self-evaluation and
        consequent program improvement will be chilled by
        disclosure;

   4.   Whether the information sought is factual data or
        evaluative summary;

   5.   Whether the party seeking the discovery is an actual
        or potential defendant in any criminal proceeding
        either pending or reasonably likely to follow from the
        incident in question;

   6.   Whether the police investigation has been completed;

3

7.  Whether      any      intra-departmental      disciplinary
    proceedings   have   arisen   or   may   arise   from   the
    investigation;

8.  Whether   the   plaintiff's   suit   is   non-frivolous   and
    brought in good faith;

9.  Whether   the   information   sought   is   available   through
    other discovery or from other sources; and

10. The   importance   of   the   information   sought   to   the
    plaintiff's case.

Id. Like this case, Frankenhauser involved a claim arising out
of an officer-involved shooting.   Although the investigation
under review had concluded when the Frankenhauser court ordered
disclosure of investigative material, that factor was not
dispositive of the Court's analysis.   Considering each of the
ten factors, the Court found the plaintiffs were entitled to
discovery of witness statements, as well as excerpts of police
reports containing purely factual data.   Id. at 345.

In this case, the Court first observes that factors 8, 9,
and 10 all favor production.   Johnson's suit is not frivolous
nor brought in bad faith.   The information sought - nearly all
of which was compiled immediately after, or in the month
following the incident - is not available from other sources.
See Castle, 142 F.R.D. at 621 (recognizing the importance of
close-in-time statements).   As the most complete factual record

4

of what happened the night Denyakin died, the importance of the information to both the plaintiff and the defendant cannot be overstated.

Conversely, factors 6 and 7 both favor non-disclosure. No decision has been made regarding criminal charges, and Portsmouth, by separate filings, confirms that its intra-departmental inquiry is ongoing. In its initial response, the VSP noted that it expected a decision on prosecution within ten days, but noted that Federal officials had requested a copy of the materials for their own purposes. As yet, no Federal agency has opposed releasing material in the VSP file. It also bears mention that all or nearly all of the material in the file was gathered in April and May, 2011, some five months ago.

Considering all of the foregoing, and subject to the terms of the previously entered Protective Order (ECF No. 36), the Court makes the following findings and rulings on the VSP's motion to quash:[1]

**Tab A-1, Summary of Investigation**

The Document behind Tab 1 constitutes the VSP's investigative summary, directed to Portsmouth Commonwealth's Attorney Earl C. Mobley. It is an evaluative summary containing the impressions of its authors concerning the evidence

---

[1] In addition to the contents of its investigative file, the VSP produced an index of its contents which it attached as an exhibit to the publically filed memorandum. (ECF No. 28-6). This Memorandum Order addresses the contents by reference to tab numbers set forth in that exhibit.

described.   In addition, most of the factual material described in the document is available in other, separately categorized materials.   Accordingly, the VSP's motion to quash is granted as to A-1, which will not be produced.

## Tab B-1, Portsmouth Police Department Reports

A number of documents behind B-1 concern investigative materials prepared by the Portsmouth Police Department.   These reports were separately subpoenaed and the Portsmouth Police Department has filed its own objections to disclosure.   Because these materials were obtained from Portsmouth Police Department, which has raised other objections to their production, the Court declines to order their production from the VSP file pending argument on Portsmouth's separate motion.

## Tabs C-1 through C-4, Crime Scene Examination

The four documents contained under the category "Crime Scene Examination", reflect objective analysis of the physical condition of the scene where the incident occurred.   This material includes photographs, drawings and measurements, as well as video evidence of the location of items recovered from the scene.   These documents contain purely factual data, which does not impact on confidentiality, or any intra-departmental or other process dependent upon citizen or officer input. Accordingly, production will have no chilling effect, nor would it impact any intra-departmental disciplinary proceedings.

While public disclosure of such information might impact the decision making process, disclosure at this stage, subject to the Protective Order, will permit the deliberative process to conclude.  All of the information in document C-1 through C-4 should be produced, subject to the Protective Order.

**Tabs D-1 through D-4, Lab Reports**

All of the documents in section D involve postmortem testing and examination of the decedent, Denyakin.  As was observed at the hearing, the autopsy report has somehow already become part of the public record.  In addition, the person seeking discovery in this case is Denyakin's Administrator.  No other confidentiality interest is implicated by production of the documents.  Accordingly, no factor warrants withholding them and they will be produced subject to the Protective Order.

**Tabs E-1 through E-6, Rankin Materials**

Materials in section E relate to the defendant, Officer Stephen Rankin.  Two of these documents, E-1 and E-5, are summaries of statements Rankin gave during the investigation. The summaries do not contain questions by any investigator, nor do they contain any evaluation or comment on Rankin's testimony. Rankin was represented by an attorney when giving the statements, and although the investigation is still ongoing, and intra-departmental disciplinary proceedings may arise, the critical importance of these close-in-time statements, their

7

purely factual nature, and the absence of any confidentiality interest weigh in favor of disclosing them. They will be produced subject to the Protective Order.

Document E-2 is a Portsmouth Police Department Incident Report relating to a prior arrest mentioned by Rankin in his statement. Document E-6 involves a press inquiry shortly after the incident. Neither of these documents involve any evaluation or deliberation concerning the evidence and they will be produced subject to the Protective Order.

The remaining two documents, E-3 and E-4, concern execution of a Facebook search warrant. This warrant was issued under seal by the Portsmouth Circuit Court. The information contained in the warrant represents investigative conclusions by the requesting officer. Accordingly, these documents may be withheld and VSP's motion to quash is granted in part with respect to E-3 and E-4.

## Tabs F-1 through F-3, Denyakin Materials

The materials in section F also relate to the decedent, Kirill Denyakin. F-1 is a report concerning the investigator's review of video footage from security cameras near the scene. F-2 contains a search warrant and return for records related to the emergency medical treatment by those who responded to the incident. The third document, F-3, is a summary of information obtained from Immigrations and Customs Enforcement concerning

Denyakin's immigration status.  These documents present purely factual data.  Although the report of video evidence in F-2 contains the investigator's observations of a person believed to be Denyakin, they amount to only a description of his physical condition without subjective characterization.  In addition, the video evidence itself is available in the event any party disagrees with the investigator's characterization.  The report contains useful time-stamped data concerning Denyakin's suspected appearance in the footage and it, along with the other two factual documents in section F, will be produced subject to the Protective Order.

## Tabs G-1 through G-23, Witness Interviews

Documents in section G include summaries of witness interviews conducted by VSP's Chief Investigator between May 5 and May 31, 2011.  The witness statements are prepared on a VSP form, and do not include the investigator's questions, only a brief description of the circumstances of the interview, followed by a narrative summary of the witnesses' statements written in the first person (as though by the witness).  The statements are not sworn or subscribed to by the witnesses, but apparently summarize the investigator's conversation with each one.

The undersigned recognizes that protecting the identity of cooperating witnesses is an important factor to consider prior

Case 2:11-cv-00415-RBS -DEM   Document 37   Filed 11/07/11   Page 10 of 15 PageID# 329

to ordering disclosure of witness statements, however, in this case, the VSP voluntarily produced the attachment summary, identifying each witness by name.  This disclosure obviates much of the protection to be gained from withholding their statements.  While it is also true that, with the witnesses identified, the information sought may be available from other sources, most of the statements were taken less than a month after the incident when memories were fresh.  Moreover, the brief nature of the statements leads the Court to conclude that their disclosure, in redacted form, is likely to greatly minimize the inconvenience to witnesses by identifying the few whose testimony might be most relevant.  Accordingly, the witness statements **with the witnesses' dates of birth and phone numbers redacted** shall be produced subject to the Protective Order.

## Tabs H-1 through H-20, Police Statements

Like civilian witness statements, police statements implicate concerns over confidentiality, the chilling effect on governmental self-evaluation and likely impact on intra-departmental disciplinary proceedings which may arise from the investigation.  However, many of these concerns relate to identifying those specific officers participating in the investigation.  As with civilian witnesses, all of the officers have already been identified in the disclosed index.   In

addition, Rankin himself identified in discovery many of the officers, who were interviewed as a result of their presence on the scene.   As with civilian statements, the officer statements are presented in a narrative fashion, without questions or other prompts from the investigator.   Most describe events on the night of Denyakin's death, but some involve other encounters between the officers and Denyakin.   Each interview summary is marked with a legend stating "This document contains neither recommendations nor conclusions of the Virginia State Police." Under these circumstances, the importance of the information to the Plaintiff's case, and the purely factual nature of the documents, favor production and witness statements H-1 through H-20 will be produced, subject to the Protective Order.

**Tabs I-1 through I-6, Chain of Custody and Request for Examinations**

Documents I-1 through I-6 are the chain of custody and request for examinations for the factual data already described elsewhere in this Memorandum Order.   These documents are purely administrative and factual in nature and do not present any of the concerns warranting nondisclosure.   They will also be produced subject to the terms of the Protective Order.

**Tabs J-1 through J-16, Audio/Video and Other Evidence**

The material behind Tab J include mostly electronic evidence compiled and copied onto CDs and DVDs.   The electronic

evidence identified as J-1 through J-9 all relate to recordings of the scene and events surrounding the night of the incident. J-1 includes photographs taken of the scene and of Denyakin on the night of the incident as well as supplemental photographs of the scene taken later.   This disc also includes photographs of Denyakin (taken earlier) which were downloaded from the internet.   J-2 contains a computerized 360° photographic image of the scene in the daytime (weeks after the incident).   J-3 includes video taken from a patrol vehicle.   J-4 is a report of time-stamped dispatch data concerning the night of the incident. J-5 is a CD including audio of the original 911 call, other calls related to the incident and dispatch communication over the police 3 channel.    J-6 and J-7 include police radio communication on two other channels.   J-8 and J-9 contain video surveillance footage from the night of the incident from nearby security cameras.   All of this material is purely factual and was compiled by the investigator from contemporaneous recordings.   Although some of the evidence may be graphic and potentially inflammatory, the concerns underlying the governmental privilege asserted generally do not apply to these purely factual compilations.  Disclosure of the information will not thwart governmental processes nor discourage citizen involvement.     While   public   disclosure   might   impact   the deliberative process, this can be managed by use of the

Protective Order. Accordingly, the undersigned directs that the evidence included in the J-1 through J-9 be produced subject to the terms of the Protective Order.

J-10 is an audio recording of an interview of Rankin, a summary of which has already been addressed. The interview contains detailed questions from the investigator, which, to that extent, may reveal his subjective impressions of the evidence. It would be difficult to edit the audio recording to produce only Rankin's statements. Because the facts are adequately described in two written statements, the recording itself need not be produced, and the VSP's motion to quash is granted with regard to J-10.

J-11 includes evidence obtained from Rankin's Facebook page pursuant to the sealed search warrant issued in Portsmouth. Absent unsealing, the undersigned declines to order the production of this material which should be available to Johnson by separate subpoena. J-12 includes field notes from the Portsmouth investigator which include – to a degree – his own subjective impressions and observations. Moreover, the data reflected in the field notes is included in other segregated, purely factual material. Accordingly, the report contained in J-12 will not be disclosed, and the VSP's motion to quash is granted with respect to J-11 and J-12.

13

J-13, J-14, and J-16 contain enhanced audio obtained from the Rankin patrol car. Again, these are contemporaneous recordings with no evaluative or subjective interpretation. They may contain critical information which is impossible to obtain from any other source and they must be produced subject to the Protective Order. J-15 and J-17 concern information obtained concerning threats allegedly made by Denyakin to a third party during an earlier incident. Although revealing, to a degree, the subjective evaluation of the investigator in pursuing the lead, the data contained in J-15 and J-17 is purely factual and should be produced.

**Tabs K-1 through K-5, Additional Material**

All of the material contained in Tab K appears to be correspondence, internal communication, copies of newspaper articles with handwritten notes and other handwritten observations of the investigators. Many of these materials contain subjective evaluations of the investigators and most repeat factual matter which will be disclosed from other sections of the investigation. Accordingly, the undersigned declines to order the production of any of the documents addressed in K-1 through K-12.

14

Subject to the terms of the Protective Order entered this day, the undersigned directs the VSP to produce the foregoing materials to Plaintiff's counsel within ten (10) days of this Order.   Costs for copying and duplication shall be paid by Plaintiff's counsel.   The materials submitted for in camera review may be retrieved from chambers by the VSP for use in making necessary copies.

                                        /s/
                              Douglas E. Miller
                              United States Magistrate Judge

                              DOUGLAS E. MILLER
                              UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

November 7, 2011