UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



JERRELL R. JOHNSON,
ADMINISTRATOR of the ESTATE
of KIRILL DENYAKIN, DECEASED,

    Plaintiff,

v.                                    Civil No. 2:11cv415

STEPHEN D. RANKIN,

    Defendant.

## OPINION

This matter comes before the court on the Defendant's Motion for Summary Judgment, which has been fully briefed and is ripe for decision.[1] For the reasons set forth herein, the Motion is **DENIED**.

### I. Factual and Procedural History

On July 1, 2011, Plaintiff Jerrell R. Johnson, on behalf of Mr. Denyakin's estate, filed the present Complaint alleging Officer Stephen Rankin used excessive force when he shot and killed Mr. Denyakin on the night of April 23, 2011. On that night, Officer Rankin, a three-year veteran of the Portsmouth

---

[1] On January 20, 2012, the Defendant filed a Request for Oral Argument on this Motion. After full examination of the briefs and the record, the court has determined that a hearing is unnecessary, as the facts and legal arguments are adequately presented, and the decisional process would not be aided significantly by oral argument. See Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J).

Police Department, was on patrol in full uniform in his marked police cruiser. Def.'s Mem. in Supp. ("Def. Mem.") 6; Pl.'s Mem. in Opp'n ("Pl. Mem.") 2. He was alone. Id. Shortly after 10:11 p.m., he received a Priority One radio call from Dispatch reporting a "burglary in progress" at 454 Green Street in Portsmouth, Virginia. Def. Mem. 6; Pl. Mem. 3-4. More specifically, the dispatcher said that a white male was banging on the glass door trying to get into the location. Pl. Mem. 4. She also gave a description of the suspect's clothing. Id.

Officer Rankin responded to the scene, arriving within ninety seconds. Def. Mem. 7; Pl. Mem. 4. Upon arrival, Officer Rankin exited his vehicle and spotted an individual matching the suspect's description, later identified as Kirill Denyakin. Id. When Officer Rankin spotted him, Mr. Denyakin had both hands over his head and was banging on the glass door to the building. Id. Mr. Denyakin's palms were open, and no weapon was visible to Officer Rankin. Pl. Mem. 4. Officer Rankin was standing approximately thirty-five feet away in an asphalt lot outside the building. Def. Mem. 8; Pl. Mem. 5. Within a matter of seconds, Officer Rankin began firing his weapon. Def. Mem. 10; Pl. Mem. 12-13. He fired eleven rounds, of which at least nine struck Mr. Denyakin, id., who fell to the ground and died shortly thereafter.

2

What happened in those intervening seconds after Officer Rankin arrived on the scene and before he opened fire is the matter of much dispute. The parties disagree about virtually all relevant facts. The following summary first recites Officer Rankin's account of what happened and then sets forth the facts most favorable to the non-moving party, the estate of Mr. Denyakin.

**A. Officer Rankin's Account**

Officer Rankin maintains that, after arriving on scene and spotting Mr. Denyakin, he drew his weapon, positioned himself, and ordered, "Stop. Police. Let me see your hands. Get down on the ground." Def. Mem. 2. In response, Mr. Denyakin stopped banging on the door, lowered his hands, and turned around to face Rankin. Id. Rankin states he then ordered Mr. Denyakin to show his hands and get down on the ground, but Mr. Denyakin refused to comply, instead thrusting his right hand deep inside the waistband of his pants. Id. at 2, 9. According to Officer Rankin, Mr. Denyakin appeared to be "digging" for something in his crotch area. Id. At this point, Officer Rankin says he called "clear the air" on his police radio, which is a signal for help that is used in an emergency. Def. Mem. 2, 9. He states he also illuminated his weapon light to better see Mr. Denyakin. Def. Reply Mem. 5.

3

According to Officer Rankin, Mr. Denyakin made a menacing facial expression and "then charged directly at [me] with his right hand still inside his pants." Id. at 2, 20. Rankin characterized this charge as "at a full run." Def. Mem. Ex. 2. Officer Rankin allegedly yelled, "Stop right there, stop right there!"; but Mr. Denyakin did not stop his charge. Id. at 2. At that point, when Mr. Denyakin had taken "about 4" steps toward him, Rankin discharged his weapon eleven times in approximately three seconds. Def. Mem. 2, 10; Pl. Mem. 12.

Hit by the gunfire, Mr. Denyakin fell to the ground, between the glass door and Officer Rankin, Def. Mem. 11; Pl. Mem. 13, and soon thereafter was pronounced dead.

### B. The Plaintiff's Account

The Plaintiff disputes Officer Rankin's account, particularly the allegations that Mr. Denyakin stuck his hand down his pants and that Mr. Denyakin charged Officer Rankin. Pl. Mem. 23. First, the Plaintiff maintains that Mr. Denyakin did not reach his right hand inside his waistband and appear to "dig" for something in his crotch area. Pl. Mem. 6. While Officer Rankin testified that Mr. Denyakin stuck his right hand in his pants past his wrist and that Mr. Denyakin's hand remained there as he started firing and even when he fell down,[2]

---

[2] Officer Rankin testified that Mr. Denyakin stuck his right hand in his pants past his wrist, Pl. Mem. Ex. 1 at 111-12, and that

4

the autopsy revealed that Mr. Denyakin suffered a deep graze gunshot wound to the radial aspect of his right wrist near his thumb. Pl. Mem. Ex. 7-8. Yet, a thorough examination revealed no bullet hole in Mr. Denyakin's pants. Pl. Mem. Ex. 9-10. Additionally, the autopsy report states that "[s]kin tags suggest that the direction of fire is from the palmar surface to the back of the hand." Pl. Mem. Ex. 7. The Plaintiff suggests that this evidence all goes to show that Mr. Denyakin's right hand was never down his pants past his wrist, and indeed, it was most likely raised with the palm towards Officer Rankin. Pl. Mem. 20-21, 26.

The Plaintiff also disputes the Defendant's claim that Mr. Denyakin charged him at a full run. Def. Mem. Ex. 2; Pl. Mem. Ex. 1 at 117. First, the Plaintiff cites the testimony of Officer Nat White. Pl. Mem. Ex. 11. After the shooting, Officer White recalls the Defendant saying that Mr. Denyakin, after sticking his right hand in his pants, started walking towards him and lunged at him. Id. at 40-42. The Plaintiff offers this testimony as inconsistent with Officer Rankin's contention that Mr. Denyakin charged him at a full run.

---

his hand remained there even as Rankin started firing. Id. at 121, 123. Rankin testified that he never saw Mr. Denyakin remove his right hand from his pants, id. at 116-17, and in a statement he prepared shortly after the incident, Officer Rankin wrote, "His hand was still in his pants during the charge at me. And I believe it was when he went down." Pl. Mem. Ex. 6.

5

Second, the Plaintiff contends that Mr. Denyakin "was so intoxicated that he could barely walk, let alone charge at Rankin at a full run with his right hand allegedly stuck in his pants past his wrist." Pl. Mem. 8. The evidence of Mr. Denyakin's intoxication includes his blood alcohol content ("BAC") and testimony from Aileen Putnam, Maurice Wilson, Natalya Wilson, and Louis Mitchell.

Aileen Putnam testified that earlier that night, at some time between 4:30 p.m. and 7:00 p.m., she was present with Mr. Denyakin in the apartment of her boyfriend, Bradley Decker, when she saw Mr. Denyakin drink approximately four to six mixed drinks containing "heavy pours" of vodka. Pl. Mem. Ex. 12 at 38-41, 45-47, 65-66, 79-81. Ms. Putnam testified that Mr. Denyakin became "very intoxicated." Id. at 38-41, 87.

At some point later that night, Mr. Denyakin returned to the apartment of Maurice and Natalya Wilson at 454 Green Street, where he was staying at the time. Pl. Mem. Ex. 5 at 25-27. Mrs. Wilson testified that he appeared to be very drunk. Id. at 26, 54. He urinated on the floor inside his room, id. at 57-58, and lost his balance and fell while attempting to walk. Id. at 66-68.

At the request of Mrs. Wilson, Mr. Denyakin was removed from the Wilsons' apartment and carried down the street by Maurice Wilson and his friend Louis Mitchell. Id. at 63-66; Pl.

6

Mem. Ex. 13 at 80-81. They left him slumped over against the side of a nearby building in an unresponsive state and smelling heavily of liquor. Pl. Mem. Ex. 13 at 85-87, 90-92.

Sometime later, Mr. Denyakin returned to the Wilsons' apartment building at 454 Green Street and began banging on the glass door. Pl. Mem. Ex. 5 at 84-86, 98-99. Mrs. Wilson saw him and observed that he was holding onto the glass door for balance. Id. Shortly thereafter, Mrs. Wilson asked her neighbor to call 911, which she did. Pl. Mem. Ex. 5 at 79-81. A dispatch was issued, and Officer Rankin responded. Def. Mem. 6-7; Pl. Mem. 3-4.

The autopsy revealed that Mr. Denyakin's BAC at the time of death was .28% by weight by volume (W/V). Pl. Mem. Ex. 14-15. At a BAC of .28% W/V, Dr. Alphonse Polkis attests that Mr. Denyakin would have been displaying numerous signs and symptoms of alcohol intoxication, to include impairments of sensory motor coordination, increased reaction time, impaired balance, staggering gait, and slurred speech. Pl. Mem. Ex. 15.

This evidence of Mr. Denyakin's severely intoxicated state, the Plaintiff contends, calls into question Officer Rankin's testimony because it suggests that Mr. Denyakin was incapable of charging at Rankin at a full run with his right hand down his pants. Rather, the Plaintiff contends that Mr. Denyakin "never charged at Rankin, or . . . at best, . . . he . . . attempt[ed]

7

to stumble in Rankin's direction at the time Rankin started shooting." Pl. Mem. 23.

**C. Other Evidence from the Record**

Officer Rankin's patrol car was equipped with an on-board computer capable of recording audio and video. Pl. Mem. Ex. 1 at 67. Exhibit 3 to the Defendant's Memorandum in Support is the video recording from Rankin's vehicle. However, due to the positioning of the vehicle, it does not capture the incident. Exhibit 4 to the Defendant's Memorandum is the audio recording from Rankin's vehicle. The gunfire is clearly audible on that recording. In addition, the Defendant contends that he can be heard shouting "Stop right there! Stop right there!" immediately before the gunfire noise begins. Def. Mem. 10; Def.'s Reply Mem. in Supp. ("Def. Reply Mem.") 1. The Plaintiff contends that, apart from the gunfire, the rest of the audio on the tape is inaudible. Pl. Mem. 14 ("[t]he only thing that can be clearly heard from the audio is when Rankin started firing at Denyakin").[3] Ordinarily, the rest of the encounter would have

---

[3] The court is mindful of the Supreme Court's decision in Scott v. Harris, 550 U.S. 372, 380-81 (2007), which held that, in considering a law enforcement officer's motion for summary judgment on a claim of excessive force, a court must view the facts in the light depicted by the videotape that captured the events underlying the claim. The videotape here did not capture the event. However, the court has reviewed the audio recording at issue and finds that, unlike in Scott, the recording does not "so utterly discredit" the Plaintiff's version of events such that no reasonable jury could believe him. See id.

8

been recorded via Officer Rankin's personal microphone, but Officer Rankin testified that he forgot to sync his personal microphone to the on-board system in his car before his shift. Pl. Mem. Ex. 1 at 67-71.

There were no witnesses to the shooting. However, Natalya Wilson was in the hallway on the the second floor of the apartment building at 454 Green Street, when the shooting occurred. She heard Officer Rankin order Mr. Denyakin to "get down, get down, get down" immediately before she heard the gunfire. Pl. Mem. Ex. 5 at 9-10. Ms. Wilson does not recall hearing Officer Rankin give any other commands, but she admits that he may have given other commands that she did not hear. Id. at 9-10, 93-94.

## II. Standard of Review

Summary judgment under Rule 56 is appropriate when the court, viewing the record as a whole and in the light most favorable to the non-moving party, finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. In reviewing the evidence, the court must draw all reasonable

9

inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence. Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004).

A court should grant summary judgment if the non-moving party, after adequate time for discovery, has failed to establish the existence of an essential element of that party's case, on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party "bears the responsibility of informing the district court of the basis for its motion" and "demonstrat[ing] the absence of a genuine issue of material fact." Id. To defeat a motion for summary judgment, the non-moving party must go beyond the facts alleged in the pleadings, instead relying upon affidavits, depositions, or other evidence to show a genuine issue of material fact for trial. See id. at 324. Conclusory statements, without specific evidentiary support, are insufficient. Causey v. Balog, 162 F.3d 795, 802 (4th Cir. 1998). Rather, "there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.

### III. Analysis

In his Memorandum in Support of the Motion, the Defendant asks the court to grant summary judgment as a matter of law because he acted reasonably under the circumstances. In the alternative, the Defendant asks the court to grant summary

judgment because he is entitled to qualified immunity. Finally, the Defendant also asks the court, should it grant his Motion for Summary Judgment as to the Plaintiff's 42 U.S.C. § 1983 claim, to exercise its discretion to grant summary judgment as to the Plaintiff's state law claims. Each of these contentions is addressed in turn.

### A. Summary Judgment on the Merits

The Fourth Amendment protects individuals against unreasonable seizures, including those accomplished by excessive force. Elliot v. Levitt, 99 F.3d 640, 643 (4th Cir. 1996). A claim that a police officer used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen is analyzed under the Fourth Amendment's objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). Specifically, the court must determine whether "a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Anderon v. Russell, 247 F.3d 125, 126 (4th Cir. 2001). The reasonableness of the officer's actions are "based on the information possessed by the officer at the moment that force is employed." Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005). Subjective factors regarding the officer's underlying intent or motivation are irrelevant. Graham, 490 U.S. at 397 (omitting citations).

11

In determining the reasonableness of the force used, the court must consider "the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Furthermore, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

The use of deadly force is reasonable "when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." Elliot, 99 F.3d at 642. An officer is not required to actually see a weapon to believe that a suspect poses such a threat. See, e.g., Anderson v. Russell, 247 F.3d 125, 131 (4th Cir. 2001); Sigman v. Town of Chapel Hill, 161 F.3d 782, 788 (4th Cir. 1998); McLenagan v. Karnes, 27 F.3d 1002, 1007 (4th Cir. 1994). Again, reasonableness is the touchstone; "mistaken, but reasonable, decisions do not transgress constitutional bounds." Henry v. Purnell, 652 F.3d 524, 532 (4th Cir. 2011).

For purposes of summary judgment, this standard of objective reasonableness is applied to the facts of this case taken in the light most favorable to the Plaintiff. E.g., United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Viewed in this light, the facts show that a severely intoxicated Mr. Denyakin was banging on the glass door of the apartment complex at 454 Green Street when Officer Rankin arrived on the scene in response to a "burglary in progress" dispatch. Officer Rankin observed no weapon on Mr. Denyakin's person. It is unclear from the Plaintiff's evidence if and to what extent Officer Rankin was issuing commands, as well as whether Mr. Denyakin was complying with those commands. However, when the Defendant opened fire, Mr. Denyakin was either standing still or was attempting to stumble in Officer Rankin's direction. He may have been holding his hands up in the air; at the very least, they were not stuck down the waistband of his pants or in any way otherwise concealed.

This set of facts starkly contrasts with Officer Rankin's testimony that Mr. Denyakin charged Rankin at a full run with his right hand in his pants past his wrist. While a mere conclusory statement creating a factual dispute is insufficient to defeat a motion for summary judgment, see Causey, 162 F.3d at 802, here the Plaintiff advances factual support for his claims. The Plaintiff points to specific forensic and testimonial

13

evidentiary support in the record, creating a genuine, material factual dispute as to, most importantly, whether Mr. Denyakin charged Officer Rankin and whether Mr. Denyakin's hand was in his pants or otherwise concealed from view.

These significant factual questions render summary judgment inappropriate because a jury could rationally conclude that Mr. Denyakin did not pose a threat of serious harm and that the Defendant's application of deadly force against him was excessive and unreasonable. As Justice Ginsburg has observed, when the Plaintiff's "excessive force claim turns on which of two conflicting stories best captures what happened on the street," summary judgment is not permitted. Saucier v. Katz, 533 U.S. 194, 216 (2001) (Ginsburg, J., dissenting on other grounds), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009). For instance, she continues, "[w]hen a plaintiff proffers evidence that the official subdued her with a chokehold even though she complied at all times with his orders, while the official proffers evidence that he used only stern words, a trial must be had." Id. The case at hand turns on which of two conflicting stories rings true to the jury. A trial must be had.

### B. Qualified Immunity

"[Q]ualified immunity affords government officials greater protection than a simple defense on the merits." Slattery v.

14

Rizzo, 939 F.2d 213, 216 (4th Cir. 1991). It "protects officers who commit Constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry, 652 F.3d at 531 (citing Saucier, 533 U.S. at 206). In other words, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

The doctrine "balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. Qualified immunity is designed to "avoid overdeterrence of energetic law enforcement by subjecting government actors to a high risk of liability." Rowland v. Perry, 41 F.3d 167, 172 (4th Cir. 1994) (citing Anderson v. Creighton, 483 U.S. 635, 638 (1987)). "The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances." Rowland, 41 F.3d at 172.

To determine whether qualified immunity applies, the court makes two inquiries. First, the court decides "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." Pearson, 555 U.S. at 232. Second, the

court determines "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." Id. If the answer to either of these questions is no, then the officer is entitled to qualified immunity. Ashcroft v. Al-Kidd, 131 S. Ct. 2074, 2080 (2011). In this way, qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force, and to ensure that before they are subjected to suit, the officers are on notice their conduct is unlawful." Saucier, 533 U.S. at 206 (internal quotation omitted).

The court has determined that there is a triable question concerning whether, in shooting Mr. Denyakin on April 23, 2011, Officer Rankin violated Mr. Denyakin's right to be free of seizures accomplished by excessive force. See supra Part III.A. The next question the court must resolve, therefore, is whether this right was clearly established on April 23, 2011. The court finds that it was.

A right is "clearly established" if it would be clear to a reasonable officer that the alleged conduct is unlawful. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In this case, clearly established federal law should have put the officer on notice that shooting Mr. Denyakin, under the circumstances alleged by the Plaintiff, was clearly unlawful. Tennessee v. Garner, 471 U.S. 1 (1985), prohibits shooting suspects who pose no

16

significant threat of death or serious physical harm. The Fourth Circuit made similar findings in <u>Gray-Hopkins v. Prince George's County, Maryland</u>, 309 F.3d 224, 231 (4th Cir. 2002), and <u>Clem v. Corbeau</u>, 284 F.3d 543, 553 (4th Cir. 2002), holding that a police officer may use deadly force to seize an individual only where that individual poses a threat of serious physical harm to the officer or others.

In <u>Gray-Hopkins</u>, 309 F.3d at 231, the Fourth Circuit held that an officer was not entitled to qualified immunity where the facts, in the light most favorable to the Plaintiff, showed that Gray-Hopkins was standing still with hands raised over his head at the time of the fatal shot. In <u>Clem</u>, 284 F.3d at 552, the Fourth Circuit held that an officer was not entitled to qualified immunity where the facts, in the light most favorable to the Plaintiff, showed that the Plaintiff was an obviously disarmed, mentally disabled older man who was stumbling around with pepper spray in his eyes when he was shot.

The Defendant is alleged to have shot an apparently unarmed man who had his hands up, or at least visible, and was, at most, stumbling in the officer's direction. A reasonable officer in these circumstances could not have believed that such conduct was lawful, and, as a result, the Defendant is not entitled to qualified immunity.

Of course, the Plaintiff ultimately may not be able to prove to the trier of fact that Mr. Denyakin did not charge Officer Rankin or that Mr. Denyakin did not have his right hand in his pants; but if the Plaintiff can so prove, it would then require no "improper second guessing" to conclude that the Defendant violated Mr. Denyakin's clearly established right to be free from excessive police force. See Clem, 284 F.3d at 552.

### C. State Law Claims

The Defendant asks the court to grant his motion for summary judgment as to the Plaintiff's 42 U.S.C. § 1983 claim, and, "[i]n so doing," asks the court to "exercise its discretion to consider and grant summary judgment as to Plaintiff's remaining state law claims." Def. Mem. 28. Those claims allege gross negligence (Count III), assault and battery (Count IV), and punitive damages (Count V). Id. Because the court denies the Defendant's motion for summary judgment as to the Plaintiff's 42 U.S.C. § 1983 claim, the court declines to grant summary judgment as to the Plaintiff's related state law claims at this juncture.

### IV. Conclusion

This case is contextual and fact-bound. It involves a genuine dispute of material fact regarding whether the Defendant violated Mr. Denyakin's clearly established constitutional right to be free of seizures accomplished by excessive force, and,

therefore, the Defendant is not entitled to judgment as a matter of law. Accordingly, the court **DENIES** the Defendant's Motion for Summary Judgment on all grounds.

The Clerk is **DIRECTED** to send a copy of this Opinion to counsel of record for the Plaintiff and for the Defendant.

It is so **ORDERED**.

/s/
Rebecca Beach Smith
Chief
United States District Judge

REBECCA BEACH SMITH
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
February 16, 2012